IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| JACQUELINE J. KENNELL, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 15-cv-03190-NKL ) |
| CAROLYN W. COLVIN,<br>Acting Commissioner<br>of Social Security | ) ) ) ) |
| Defendant. | ) ) |

**ORDER**

Before the Court is Plaintiff Jacqueline Kennell's appeal of the Commissioner of Social Security's final decision denying her application for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act. [Doc. 3]. For the following reasons, the Commissioner's decision is affirmed.

**I.     Background**

Plaintiff Jacqueline Kennell was born on September 19, 1972. She completed some high school and has a GED. Kennell performed past work manufacturing engine parts, building transmission inputs, and cleaning hotels. In her application filed on June 26, 2012, Kennell alleges an onset date of September 11, 2009 stemming from depression, panic disorder, chronic neck pain following a cervical fusion, coronary artery disease, and anxiety.

**A.  Medical History**

1

In October 2007, Kennell injured her neck while working as a mechanic at Diesel Exchange. [Tr. 379]. As a result, on February 19, 2008, Dr. Sunghoon Lee performed a 2-level cervical fusion on Kennell's neck. [Tr. 382]. Kennell initially demonstrated improvement after the surgery, [Tr. 383], but she reinjured her neck in July 2009 and was diagnosed with a cervical sprain and trapezius sprain, [Tr. 386]. She was directed to take over-the-counter pain relief medications. *Id*. Kennell also received physical therapy and other treatment through her workers' compensation insurance, but her neck pain persisted and she stopped treatment at St. John's Physical Therapy after stating that her insurance did not sufficiently cover the cost. [Tr. 384].

The day after her 2007 neck injury, on October 18, 2007, Kennell received treatment at St. John's Hospital for reported panic attacks. [Tr. 379]. While Kennell stated that she had never suffered panic attacks before her neck injury, she was diagnosed with depression at age 17, in large part, she believes, due to sexual abuse she suffered as a child. [Tr. 380, 1563]. According to Kennell, she has taken anti-depressants for most of her life. [Tr. 1561].

Kennell later reported increased anxiety and stopped taking her prescription of Celexa, an antidepressant. [Tr. 387]. When Kennell presented at Ozarks Community Hospital in 2010, she was given a prescription for Ativan and instructed to resume taking Celexa daily. *Id*. Kennell also presented at Jordan Valley Community Health Center in June 2010. She reported that her depression had improved but her anxiety had worsened. [Tr. 387-88]. Sarah Jones, a nurse practitioner, diagnosed Kennell with depression and instructed her to continue taking Effexor. [Tr. 388].

Around this time, Kennell also expressed fears that she was going to have a heart attack and took a beta blocker to slow her heart rate. [Tr. 383]. In June 2012, she presented at Mercy

Hospital with chest pain. [Tr. 425]. However, she was told by emergency room personnel that her chest pain was the result of anxiety. [Tr. 426].

Kennell's treating physician, Dr. Malcolm Oliver, provided a medical opinion in August 2013. Dr. Oliver diagnosed Kennell with chronic depression, coronary artery disease with a history of myocardial infraction, and panic disorder. [Tr. 1589]. Dr. Oliver opined that these impairments would restrict Kennell's ability to concentrate and work under extreme temperatures. As a result, Dr. Oliver concluded, Kennell's condition would likely deteriorate under workplace stress and she would likely miss four or more work days per month. [Tr. 1590].

On March 7, 2011, Kennell presented to Dr. Shane Bennoch, who evaluated her as part of her workers' compensation claim. Bennoch opined that Kennell was limited in her upper extremities as a result of her neck injury. [Tr. 393-94]. He concluded that Kennell could infrequently lift or carry 20 pounds, stand or walk for about 6 hours out of an 8-hour work day, and push or pull objects no greater than 40 pounds and in a nonrepetitive fashion. [Tr. 393]. Dr. Bennoch further concluded that Kennell was limited in her overhead reach but otherwise had unlimited manipulative abilities in her hands and fingers. [Tr. 394]. While Dr. Bennoch did not state that Kennell was unable to work, he remarked that "jobs requiring repetitive lifting or a lot of change in position . . . should be avoided or held to a minimum." *Id*.

In 2012, Kennell completed three treatment sessions with Richard Boyd, M.S., a therapist. Boyd diagnosed Kennell with depression and generalized anxiety disorder. [Tr. 417]. He noted that Kennell's living situation was poor because she had been residing with her 22-year-old son, with whom she had conflicts, since her financial situation worsened in 2011. [Tr. 421]. Kennell expressed worries about her finances, health, and family issues. *Id*. As a result, Boyd opined, Kennell was overwhelmed by her circumstances, demonstrated feelings of

3

helplessness, and was reporting increased insomnia, fatigue, anxiety, and worry. [Tr. 418]. Kennell's worries prevented her from feeling calm or at ease, Boyd concluded. *Id*. He described the severity of Kennell's depression as "moderate" and assessed her GAF score in the 50 to 55 range. [Tr. 417-18].

Boyd also submitted a medical source statement in July 2012. In the statement, he opined that Kennell has marked limitations in 10 out of 20 areas of functioning: in her ability to understand and remember detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule and maintain regular attendance, complete a normal workday and work week without interruption, interact appropriately with the general public, accept instructions and respond appropriately to criticism, get along with co-workers without distractions or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic cleanliness standards, travel in unfamiliar places, and set realistic goals or make independent plans. [Tr. 441-43]. Boyd concluded that Kennell's impairments would cause her to miss four or more days of work per month. [Tr. 443].

In advance of Kennell's disability hearing, Steven Akeson, Psy.D., evaluated Kennell's medical records and reached a diagnosis of acute myocardial infraction, discogenic and degenerative back disorder, affective disorder, and anxiety disorder. [Tr. 496]. Dr. Akeson opined, however, that none of these impairments were severe and that, although they resulted in some pain and limitations, they do not preclude work activity. [Tr. 495]. Dr. Akeson arrived at this conclusion by assessing Boyd's opinion, which he found technically flawed and internally inconsistent, and by considering Kennell's medical history, which, he found, demonstrates mild symptoms, moderate treatment, and no signs of severe impairments in daily activities. [Tr. 495,

4

497, 500]. Dr. Akeson finally opined that Kennell could frequently lift 10 pounds, occasionally lift 20 pounds, and stand or walk for 6 hours out of an 8-hour workday. [Tr. 498].

Dr. James Jackson, Ph.D., also conducted a psychological evaluation in advance of Kennell's hearing. During her evaluation, Kennell complained of pain and psychological distress. [Tr. 1567]. Dr. Jackson determined that Kennell suffered from significant psychological problems. [Tr. 1563]. Specifically, he opined that Kennell was dependent upon—but at odds with—her family members, prone to waves of anxiety, defeatist in outlook, and preoccupied with health concerns. Dr. Jackson noted, however, that Kennell's physical complaints were likely extreme. [Tr. 1567-69]. He ultimately diagnosed Kennell with major depressive disorder, panic disorder with agoraphobia, and pain disorder caused both by psychological factors and by Kennell's general medical condition. [Tr. 1572]. While he described Kennell's depressive disorder as moderate and opined that her work injuries, on their own, did not render her disabled, Dr. Jackson concluded that Kennell is permanently disabled when considering the sum of her impairments. [Tr. 1573].

At her hearing, Kennell testified that she lived in her oldest son's apartment along with his friend and her younger son. Kennell stated that she had not worked since September 2009, her alleged onset date, around the time she was fired from a job at a manufacturing plant. [Tr. 96]. Kennell claimed that she has been unable to work due to constant fatigue, aches, pains, and headaches caused by her neck impairment. [Tr. 101]. While Kennell stated that she could stand for an hour on a good day, she maintained that such days are rare and ordinarily she spends most of her time sitting in a recliner chair in her living room. [Tr. 100]. When afflicted with a severe headache, which Kennell testified occurred regularly, she would sleep for several hours. [Tr.

102]. Otherwise Kennell stated that she spends significant time playing games on her computer. [Tr. 109].

Kennell further stated that she does laundry for her youngest son, but rarely cooks, shops, or cleans for the family. [Tr. 108-09]. She testified that she could drive, although she did not have money to pay her vehicle registration. [Tr. 95]. And Kennell acknowledged that medication has improved her panic attacks, but maintained that her psychological symptoms had worsened since her 2007 neck injury. [Tr. 112, 115].

George Horne, a vocational expert, also testified at Kennell's hearing. In response to questions posed by the ALJ, Horne opined that a person with physical limitations and Kennell's background could perform sedentary jobs that exist in the national and state economies. [Tr. 118-19]. On cross-examination, Kennell's counsel asked Horne whether a person with "moderate restrictions"—defined as limitations causing weekly unscheduled work breaks or an inability to perform up to 20% of daily work—could similarly find unskilled employment. Horne responded that such a person would not be able to sustain competitive employment on a full-time basis. [Tr. 121].

**B. ALJ's Decision**

After the hearing, the ALJ issued a decision on November 12, 2013. He found that Kennell suffered from the following severe impairments: a history of coronary artery disease with myocardial infarction and stenting, degenerative disk disease of the cervical spine status post fusion, major depressive disorder, panic disorder, and generalized anxiety disorder. [Tr. 69]. Relying on the testimony of George Horne, the vocational expert, the ALJ concluded that Kennell is unable to perform past relevant work but, considering her age, education, experience,

6

and limitations, Kennell could find other jobs that exist in significant numbers in the national economy.

As part of this analysis, the ALJ assessed Kennell's RFC as follows:

[Kennell] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: she can lift and carry 20 pounds occasionally; she can lift and carry 10 pounds frequently; she can stand and/or walk six hours in an 8-hour workday; she can sit six hours in an 8-hour workday; she can push and/or pull the same weights; she should do no climbing of ladders, ropes, or scaffolds; she should only occasionally climb ramps and stairs; she should only occasionally balance, stoop, kneel, crouch, and crawl; she can perform tasks requiring no more than occasional turning of her head from side to side; she must avoid concentrated exposure to temperature extremes, vibration, and hazards, such as, unprotected heights and dangerous moving machinery; and she can perform simple, routine tasks requiring no more than occasional contact with the public, occasional, superficial interaction with coworkers and supervisors.

[Tr. 74].

The ALJ reached this RFC by "consider[ing]" the opinion of Dr. Akeson, who opined that Kennell displayed only mild limitations in her daily activities, social functioning, concentration, persistence, and pace. [Tr. 73]. In doing so, the ALJ agreed with Dr. Akeson's conclusion that Kennell's limitations were not extreme, but disagreed with Dr. Akeson's opinion that Kennell displayed no severe mental impairments whatsoever. [Tr. 73, 79]. The ALJ further gave "considerable" weight to Dr. Bennoch's opinion that Kennell could perform work with only moderate physical restrictions. [Tr. 77]. Additionally, the ALJ gave "little weight" to components of Boyd, Dr. Jackson, and Dr. Oliver's opinions: he discounted Boyd's opinion that Kennell was extremely limited in ten areas of functional capacity, Dr. Jackson's conclusion that Kennell displayed marked limitations in several functional categories and was rendered significantly disabled by the sum of her impairments, and Dr. Oliver's assessment as to the

7

extremity of Kennell's physical limitations, including his conclusion that Kennell's impairments would cause her four or more absences per month. [Tr. 77-79].

In discounting Boyd's opinion, the ALJ concluded that it "contrast[ed] sharply with the other evidence of record," failed to acknowledge that certain symptoms, including Kennell's panic attacks, "have been controlled with her current medications," and was inconsistent with both Boyd's treatment notes and the course of treatment that he pursued. [Tr. 78].

The ALJ similarly discounted Dr. Jackson's opinion because it was "not consistent with treatment records," with Kennell's "own reported activities of daily living," and with "the medical evidence of record in general." *Id*. The ALJ further noted that Dr. Jackson, as a consultative examiner, did not have a treatment relationship with Kennell. *Id*.

In discounting Dr. Oliver's opinion, the ALJ concluded that the extreme limitations cited by Dr. Oliver were not reflected on the record because Kennell's cardiac condition was well-controlled by medication, her panic attacks were not incapacitating, and, broadly, Dr. Oliver's opinion is inconsistent with his treatment notes and with the record as a whole. [Tr. 79].

Finally, the ALJ determined that Kennell was "not entirely credible" because, while her alleged symptoms were reflected in the medical record to the extent they were consistent with a light exertional RFC, she overstated the intensity of these symptoms in her testimony. [Tr. 75]. Specifically, the ALJ noted Kennell's daily activities, including an average of six hours on the computer despite her reports of headaches and impaired concentration; her treatment history, which had been generally successful in controlling her symptoms; the situational nature of her symptoms, which stemed in part from financial and other problems; and the fact that Kennell returned to work after her initial neck surgery. [Tr. 76].

8

**II. Discussion**

A district court will reverse the Commissioner's findings "only if they are not supported by substantial evidence or result from an error of law." *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). Kennell argues that the Commissioner's decision is not supported by substantial evidence in the record as a whole because, first, the ALJ assessed Kennell's RFC after improperly discounting the opinions of Boyd, Dr. Bennoch, and Dr. Oliver. Second, Kennell contends the ALJ erred in ignoring the vocational expert's testimony that an impaired individual, as defined based on several hypothetical questions, would be unable to maintain regular employment. Finally, Kennell challenges the ALJ's finding that her testimony regarding the severity of her symptoms was not fully credible.

**A. Weight Given to Boyd's Opinion**

Kennell argues that Boyd was a treating source, and therefore that his opinion should be afforded controlling weight, because Boyd is a "psychologist" who conducted "regular therapy sessions" with her. [Doc. 11, p. 6]. Generally, a treating source's opinion is entitled controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). *See also Wagner v. Astrue*, 499 F.3d 842, 848–49 (8th Cir. 2007).

The record does not indicate, however, that Boyd served as a treating source for Kennell. Although Kennell refers to Boyd as a psychologist, he is repeatedly referenced in the record as "Richard Boyd, M.S." *See* [Tr. 406, 407, 417, 419, 420, 423]. In one document on the record, Boyd is listed as "Ph.D., Psy.D." on a typed form, but Boyd crossed out this description by hand when he completed the document. *See* [Tr. 444]. The Court thus cannot find any support for

9

Kennell's statement that Boyd is a licensed psychologist.

The evidence supports a finding that Boyd is at most a licensed therapist, and as such his opinion is considered "other medical evidence." *Lacroix v. Barnhart*, 465 F.3d 881, 886-87 (8th Cir. 2006) (*citing* 20 C.F.R. §§ 404.1502, 404.1513(a)) (noting that a "treating source" is defined as a "physician, psychologist, or other acceptable medical source," and that the regulations exclude therapists from the list of "other acceptable medical sources"). *See also Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) ("A therapist is not an acceptable medical source to establish a medically determinable impairment.") (internal quotation marks omitted). The Eighth Circuit has remarked that "other medical evidence" is not entitled any weight; rather, when considering this evidence, "the ALJ has more discretion and is permitted to consider any inconsistencies found within the record." *Raney*, 396 F.3d at 1010. In exercising his discretion, an ALJ may give weight to other evidence when the source "has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." SSR 06-03p, 2006 WL 2329939, at *5 (Aug. 9, 2006).

The record reflects that Boyd's treating relationship with Kennell was limited to three sessions over the course of one month in 2012. *See* [Tr. 406-07, 418-19]. Boyd thus only observed Kennell over a brief temporal period, especially considering that "[a]n individual's level of [mental] functioning may vary considerably over time," 20 C.F.R. Pt. 404, Subpart P, App. 1, § 12.00(D), and therefore longitudinal data is particularly relevant when evaluating mental impairments. *Andler v. Chater,* 100 F.3d 1389, 1393 (8th Cir. 1996). Boyd's notes also indicate he believed Kennell's anxieties could be addressed with weekly therapy, but it appears Kennell did not pursue this course of treatment. *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) (finding that failure to follow a course of treatment, absent good reason, is grounds for

denying a claim for benefits). Even if Kennell had a good reason to discontinue her treatment with Boyd, their relationship—limited to three sessions within a month of her social security application—cannot be considered an ongoing one. *Gowell v. Apfel*, 242 F.3d 793, 798 (8th Cir. 2001) (lack of ongoing counseling disfavors a disability finding based on mental impairments).

The ALJ thus did not owe Boyd's opinion deference.

Even assuming Boyd is a psychologist, substantial evidence supports the ALJ's finding that his opinion is internally inconsistent with his evaluation of Kennell and his treatment of her mental impairments. While Boyd opined that Kennell displayed marked limitations in ten areas of functioning and would miss four or more work days per month, he assessed Kennell's GAF score in the 50 to 55 range, a figure that reflects more moderate impairments. *See* DSM–IV–TR 34 (scores of 51 or better are consistent with "moderate" symptoms); *Halverson v. Astrue,* 600 F.3d 922, 930 (8th Cir. 2010) (an ALJ may rely, in part, on GAF scores "between 52 and 60" in discounting a source's opinion that the claimant would be unable to sustain employment). Further, Boyd noted after his first session with Kennell that she displayed appropriate motivation, verbal fluency, and grooming. [Tr. 371-372]. He diagnosed her with depression of a mild to moderate severity. [Tr. 372, 418]. While he recommended weekly therapy sessions, Boyd offered in conclusion that "[t]here are no noted barriers that would impair [Kennell's] ability to achieve goals on the treatment plan with the next year, which would put the tentative termination of therapy in June of 2013." [Tr. 373]. On subsequent visits, moreover, Boyd noted Kennell's depression and anxiety, but observed that her anxieties stemmed, in part, from her living situation and concluded that her depression was moderate. [Tr. 406, 407, 418].

Boyd's treatment notes thus do not reflect the severe impairments he indicated in his opinion. *Flynn v. Astrue*, 513 F.3d 788, 793-94 (8th Cir. 2008) (finding the ALJ properly

11

discounted a source's opinion when they were inconsistent with his treatment notes).

Finally, the ALJ found that Boyd's opinion was also inconsistent with the record as a whole because it "constrast[ed] sharply with the other evidence of record, especially considering [Kennell's] reports that her panic attacks have been controlled with her current medications." [Tr. 78]. Substantial evidence supports this conclusion. Throughout the record, medical notes describe Kennell's medications as effective in easing her anxiety. *See* [Tr. 795, 809, 912, 981, 1135, 1144, 1308, 1312]. Kennell also testified that, at the time of her hearing, she had not recently suffered panic attacks because she was taking Ativan to prevent their occurrence. [Tr. 112]. Therefore, both the medical record and Kennell's own testimony indicate that her mental symptoms improved with treatment and thus the severity of these symptoms could be controlled. *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) ("[Claimant's] symptoms improved with treatment, and thus, despite [claimant's] allegations of disabling levels of pain, the record showed he could use treatment to control the severity of the symptoms."). As the ALJ properly found, this evidence is inconsistent with Boyd's opinion of disabling limitations. *See Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir. 1993) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.").

### B. Weight Given to Dr. Oliver and Dr. Bennoch's Opinions

Kennell contends that the ALJ erred in assessing her physical RFC because he "summarily" rejected the opinions of Dr. Oliver and Dr. Bennoch without citing any contrary evidence on the record. [Doc. 11, p. 9].

Yet in discussing both doctors' opinions, the ALJ cited evidence on the record. *See* [Tr. 78-79] (finding that Dr. Oliver's opinion is inconsistent with his treatment notes and Kennell's effective medication regimen); [Tr. 77] (assessing which elements of Dr. Bennoch's opinion are

12

consistent with the record and which elements are not). In fact, after considering Dr. Bennoch's opinion in light of the record as a whole, the ALJ gave Dr. Bennoch "considerable weight," discounting only Dr. Bennoch's conclusion that Kennell is limited in overhead reaching and climbing, and that she is disabled. [Tr. 77]. A medical opinion that the claimant is disabled is not entitled any weight. *House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007). Further, given that Dr. Bennoch only examined Kennell once, he is not considered a treating source. 20 C.F.R. § 404.1502 (defining "treating source" as an "acceptable medical source who . . . has, or has had, an ongoing treatment relationship with you"). The ALJ may thus discount Dr. Bennoch's opinion if, among other factors, it is inconsistent with the record or unsupported by the record. *Wagner*, 499 F.3d at 848 (*citing* 20 C.F.R. § 404.1527(d)). Both of these factors are apparent in the ALJ's assessment.

Dr. Oliver, on the other hand, served as Kennell's treating physician, and so his opinion is entitled controlling weight unless "other medical assessments are supported by better or more thorough medical evidence, or . . . [he] renders inconsistent opinions that undermine the credibility of such opinions." *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015) (*citing Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). Yet even in this situation, the ALJ must offer "good reasons" for discounting the treating physician's conclusions. 20 C.F.R. § 404.1527(d)(2).

The ALJ gave good reasons for discounting Dr. Oliver's opinion. According to his Medical Questionnaire, Dr. Oliver diagnosed Kennell with coronary artery disease, chronic depression, and panic disorder. [Tr. 1589]. Based on this diagnosis, Dr. Oliver concluded that Kennell's heart condition would be exacerbated by extreme temperatures, her depression would impede concentration, and her panic attacks were incapacitating such that she would miss work four or more times per month. [Tr. 1589-90]. The ALJ cited to evidence on the record,

13

however, indicating that Kennell's heart condition, depression, and panic were all effectively controlled by medication. *See* [Tr. 104, 112]. As observed above, "[i]f an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir. 1993).

Dr. Oliver also concluded that Kennell could lift less than ten pounds occasionally, less than five pounds frequently, and that she could stand for two hours out of an eight-hour workday. [Tr. 1589]. Kennell maintains that these limitations "are commensurate with a claimant who has undergone a 2 level cervical fusion, reinjured her cervical spine, and suffers from coronary artery disease." [Doc. 11, p. 9]. Kennell does not provide medical support for this statement, let alone explain whether Dr. Oliver, whose opinion does not mention Kennell's cervical injury, based any of his conclusions upon that impairment.

The ALJ did not err in discounting Dr. Oliver and Dr. Bennoch's opinions.

**C. Testimony of the Vocational Expert**

Kennell remarks in her briefing that "[t]he [vocational expert] testified that Kennell's moderate impairment in 3 key areas of mental functioning would preclude competitive employment" because she would miss four or more days of work per month. [Doc. 11, p.7]. Yet despite this testimony, Kennell argues, the ALJ formulated her RFC without explaining how Kennell could find a job in the national economy with this high absence rate.

The vocational expert's testimony, however, was offered in response to questions posed by Kennell's attorney, who formulated hypotheticals based first on Boyd and Dr. Jackson's opinions that Kennell would miss four days of work monthly, and second based on definitions of "moderate" that assumed an inability to complete a workday without interruption. Because the ALJ discounted Boyd and Dr. Jackson's opinions regarding the frequency of Kennell's absences,

he was not required to consider the attorney's hypothetical question when formulating the RFC. *Goose v. Apfel,* 238 F.3d 981, 985 (8th Cir. 2001) (the ALJ is only required to include impairments substantially supported by the record as a whole). *See also Haggard v. Apfel,* 201 F.3d 591, 595 (8th Cir. 1999) ("A hypothetical question is sufficient if it sets forth the impairments which are accepted as true by the ALJ.") (internal quotation marks omitted).

Moreover, the remaining hypothetical questions posed by Kennell's attorney provided a definition of "moderate" that does not reflect Eighth Circuit precedent. *See Roberson v. Astrue,* 481 F.3d 1020, 1024–25 (8th Cir. 2007) (affirming an ALJ's decision that defined "moderate" as more than a slight limitation, but one "not prevent[ing] an individual from functioning satisfactorily"); *Lacroix v. Barnhart,* 465 F.3d 881, 888 (8th Cir. 2006) (a claimant with moderate limitations "would be able to function satisfactorily"). The ALJ was not required to rely on this definition or explain his reasons for discounting the testimony it produced.

### D. Kennell's Credibility

Kennell also challenges the ALJ's credibility findings. In his decision, the ALJ found that Kennell's medical impairments could reasonably cause her alleged symptoms. He concluded, however, that Kennell is "not fully credible" regarding the claimed severity of these symptoms. [Tr. 75].

A court generally will not disturb an ALJ's credibility determinations. *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."). As such, "[i]f an ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so, [a court] will normally defer to that judgment" as well. *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990). Such a determination must "recognize[] and consider[]" the factors set out in *Polaski v. Heckler*, 739

15

F.2d 1320, 1321–22 (8th Cir. 1984), which include: (1) a claimant's daily activities; (2) the duration, frequency, and intensity of the claimant's pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004).

The ALJ discussed several of these factors in discounting Kennell's credibility. First, he noted that Kennell's daily activities are not consistent with her claims of disabling impairments. *See* [Tr. 230-35] (Kennell reporting that she plays computer games, talks to neighbors, goes to appointments, helps care for her son and dog, cooks, does laundry weekly, goes shopping, and can drive a car). Second, the ALJ discussed Kennell's medical treatment, and he remarked, as discussed above, that the record reflects the effectiveness of this treatment in relieving Kennell's physical and mental symptoms.

Nevertheless, Kennell maintains that the ALJ's credibility determination is flawed because he found her mental impairments "somewhat situational," [Tr. 76], yet he did not base this conclusion on a medical opinion in the record, he did not question Kennell about changes in her life stressors, and he therefore had no grounds to imply that the situational triggers of her symptoms no longer existed.

Contrary to Kennell's argument, substantial evidence on the record supports the ALJ's finding that her mental symptoms were, in significant part, a product of her financial and domestic concerns. *See* [Tr. 371, 406, 421, 437, 445, 447, 454, 459, 463, 470, 1119]. At her hearing, in response to questioning from the ALJ, Kennell stated that her stress was conditioned on "what's going on around [her]." [Tr. 106]. The ALJ later asked "what kind of situations would [Kennell] have a panic attack in usually?" [Tr. 115]. Although he did not expressly ask about changes in Kennell's finances and living situation, the ALJ was not required to discuss

16

these details in order to develop the record, especially considering his decision does not state that Kennell's situational triggers no longer existed. Rather, the ALJ merely notes that the situational nature of Kennell's symptoms is relevant when assessing the severity of her claims. *Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) (finding depression not severe because it was, in part, situational in nature).

Kennell also argues that the ALJ's credibility determination "failed to properly consider Kennell's work history." [Doc. 11, p. 10]. While the Eighth Circuit has found that a "claimant with a good work record is entitled to substantial credibility," *Nunn v. Heckler*, 732 F.2d 645, 648 (8th Cir. 1984), no case holds that this work history is dispositive if the *Polaski* factors otherwise cut against the claimant's credibility. *See Lanning v. Heckler*, 777 F.2d 1316, 1317-18 (8th Cir. 1985); *Nunn*, 732 F.2d at 648; *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983) (all concluding that the ALJ improperly discounted the credibility of the claimant, who had a strong work history; the ALJ's conclusion was unsupported and contradicted by the record). In discounting Kennell's credibility, as noted above, the ALJ considered several *Polaski* factors and found that the claimed severity of her impairments was not supported by the record as a whole. The Court cannot say the ALJ erred in reaching this conclusion.

**III. Conclusion**

For the foregoing reasons, the Commissioner's decision is affirmed.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: January 19, 2016
Jefferson City, Missouri